UNITED STATES,

v.

Jeremy COUCH, Defendant.

No. 04–CR–570 (LEK).

United States District Court,
N.D. New York.

July 11, 2005.

Gene V. Primomo, Office of the Federal Public Defender—Albany Office, Albany, NY, for Defendant.

Carlos A. Moreno, Office of United States Attorney, Albany, NY, for Plaintiff.

### MEMORANDUM–DECISION AND ORDER [1]

KAHN, District Judge.

Before this Court is a motion by Jeremy Couch ("Defendant") requesting suppression of the physical evidence and statements taken from him on May 14, 2004 as evidence obtained in violation of the Fourth Amendment. For the following reasons, the motion is granted.

## I. BACKGROUND

The Schenectady Municipal Housing Association ("SMHA") is a federally subsidized housing authority governed by the United States Department of Housing and Urban Development ("HUD") and subject to Congressional acts, applicable statutes, executive orders, HUD rules and regulations, including Title 24 of the Code of Federal Regulations. Transcript of Evidentiary Hearing held on April 6, 2005 ("Tr.") at 8, 12, 57. Defendant's sister, Kenya Rowe ("Rowe"), leased an apartment, 80 Steinmetz Homes, from SMHA beginning on October 17, 2002. Gov't Ex. 1.[2] Article 18 of the lease allows the landlord to "enter a unit, during reasonable hours, for routine inspections, repairs or maintenance, making improvements, or to

---

1. For printed publication in the Federal Reporter.

2. Exhibit numbers refer to exhibits presented at the April 6, 2005 Evidentiary Hearing.

show the apartment for releasing." *Id.* Pursuant to Article 18 of the lease, written notice of the entry must be given at least two days in advance. *Id.*

On May 10, 2004, SHMA Tenant Investigator Denise Brucker ("Brucker") received numerous complaints concerning noise and individuals not on the lease entering Rowe's apartment. Tr. at 98, 100. An "Incident Report" was prepared indicating in the narrative section that: "lot of noise, people in/out. Several comp. [complaints] about possible drug trafficking ... Brother may be living there—recently released from prison." Gov't Ex. 2. As a result, Brucker believed that possible lease violations were occurring, and on May 10, 2004, pursuant to Rowe's lease agreement and 24 C.F.R. § 966.4(j), sent a "Two (2) Day Entry Notice" to Rowe at 80 Steinmetz Homes by first class mail, informing her that a lease inspection was going to occur. Tr. at 77–78, 95, 101; Gov't Ex. 3.

On the morning of May 14, 2004, the lease inspection of 80 Steinmetz Homes took place. No search warrant was obtained prior to entry. Tr. at 126. Brucker was accompanied by Arthur Zampella ("Zampella"), the SHMA Security Coordinator and a Sergeant with the City of Schenectady Police Department, William Gallop ("Gallop"), a SHMA representative and an officer with the Glenville Police Department, and a Schenectady County Sheriff's Department canine Zimmer, handled by Deputy David Leffingwell ("Leffingwell"). Tr. at 102–03, 138, 178–79. The group entered through an unlocked back door after knocking and announcing their presence, and observed Defendant sleeping on the coach in the living room. Tr. at 105, 139, 178. The upstairs portion of the apartment was inspected by Gallop, Leffingwell, and canine Zimmer for lease violations. Tr. at 108, 140, 178. Defendant was then asked by Zampella to move to

the kitchen so that the couch and living room area could be inspected, at which point Gallop observed that Defendant had a handgun in his waistband. Tr. at 108, 141, 181–82. In response to his observation, Gallop yelled "gun", the officers restrained Defendant, took possession of the handgun, and placed Defendant in handcuffs. Tr. at 108–09, 142, 182. Zampella then contacted the City of Schenectady Police Department to arrest and transport Defendant. Tr. at 143, 182. After the handgun was seized from him, Defendant stated that the handgun was not his and that he had found it the night before. Tr. at 109, 144; Def. Ex. 4. Defendant was subsequently indicted on charges under 18 U.S.C. §§ 922(g) and 924(a)(2) for possession of a firearm after having been previously convicted of a felony. Dkt. No. 11.

On January 7, 2005, Defendant filed this motion requesting suppression of the physical evidence and statements taken from him on May 14, 2004 as evidence obtained in violation of the Fourth Amendment. Dkt. No. 14. A suppression hearing was held on April 6, 2005. Dkt. No. 27.

## II. DISCUSSION

Defendant asserts that the physical evidence should be suppressed because Zampella, Gallop, and Leffingwell, as on or off-duty law enforcement personnel, were investigating possible criminal activity, and therefore were government actors required to act in accordance with the Fourth Amendment. Def. Memo. (Dkt. No. 28) at 3. Alternatively, Defendant contends that even if Zampella and Gallop were functioning as private employees for SMHA, their relationship with the Schenectady County Sheriff's Department and the inclusion of Leffingwell made them agents or instruments of the Sheriff's Department. *Id.* at 5. The Defendant also states that oral statements he made to

54

Zampella, Gallop, and Leffingwell concerning ownership of the handgun should be suppressed as fruit of an unconstitutional search.

The Government asserts that the inspection of Rowe's residence was performed in conformity with Rowe's lease agreement and the Code of Federal Regulations and that Zampella, Gallop, and Leffingwell were not acting in their official capacities as law enforcement officers, but rather as SMHA representatives at the time of the lease inspection. Gov't Memo. (Dkt. No. 29) at 12.

## A. Permissibility of Lease Inspection

The goal of SMHA is to provide safe, sanitary housing to low-income individuals, elderly families, and families of individuals with disabilities. Tr. at 8–9. To ensure such safe and sanitary housing, the tenants' standard lease agreement contains prohibitions on certain objectionable activities and remedies to address suspected lease violations. In this particular circumstance, Article 15 of Rowe's lease agreement outlined various tenant obligations, including prohibitions on providing accommodations to boarders or lodgers, engaging in conduct that disturbs neighbors, engaging in illegal activity or activity that impairs the physical or social environment of the neighborhood, and engaging in unlawful or disorderly conduct that is a hazard to safety. Gov't Ex. 1. Article 18 of Rowe's lease creates a right for SMHA to inspect a tenant's apartment by providing that:

3. 24 C.F.R. § 966.4(j)(1) provides:
 The PHA [Public Housing Authority] shall, upon reasonable advance notification to the tenant, be permitted to enter a dwelling during reasonable hours for the purposes of performing routine inspections and maintenance, for making improvements or

1. The Authority's representative shall be permitted to enter a unit, during reasonable hours, for routine inspections, repairs or maintenance, making improvements, or to show the apartment for releasing.

2. Written notice, specifying reasons for entry and delivered to the unit at least 2 days in advance, constitutes "reasonable notification."

Gov't Ex. 1. This lease provision tracks the provisions found in Title 24 of the Code of Federal Regulations § 966.4(j)(1).[3]

■ On May 10, 2004, Brucker, a SHMA tenant investigator, after receiving various complaints concerning Rowe's apartment including noise, persons not on the lease being present, and possible drug activity, sent Rowe a Two–Day Entry Notice stating that an inspection for possible lease violations would occur. Tr. at 77–78, 95, 101; Gov't Ex. 3. The Court finds that this notice complied with Article 18 of Rowe's lease agreement and 24 C.F.R. § 966.4(j)(1). As a result, SMHA did have the authority to enter Rowe's apartment to inspect for lease violations on May 14, 2004.

## B. Capacity of Off–Duty Police Officers To Perform Lease Inspection

Regardless of SMHA's authority to perform a lease inspection, it must also be determined whether Zampella, Gallop, and Leffingwell were required to comply with the constitutional requirements of the Fourth Amendment, such that the failure to comply with those requirements tainted

repairs, or to show the apartment for releasing. A written statement specifying the purpose of the PHA entry and delivered to the dwelling unit at least two days before such entry shall be considered reasonable advance notification
24 C.F.R. § 966.4(j)(1).

the evidence that was obtained and requires its exclusion.

▮ The first clause of the Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ...." U.S. CONST. amend. IV. Implicit in that guarantee is the requirement that an agent of the government perform those searches and seizures. *Burdeau v. McDowell,* 256 U.S. 465, 475, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). The Supreme Court has held that the Fourth Amendment is "wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any government official.' " *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) (citing *Walter v. United States,* 447 U.S. 649, 662, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980)); *see also United States v. Bennett,* 709 F.2d 803, 805 (2d Cir.1983).

▮ The party objecting to the search has the burden to establish by a preponderance of the evidence that the government involvement was significant enough to change the character of the search. *See United States v. Feffer,* 831 F.2d 734, 739 (7th Cir.1987); *United States v. Snowadzki,* 723 F.2d 1427, 1429 (9th Cir.1984). Defendant must therefore demonstrate either that Zampella, Gallop, or Leffingwell were in fact acting in their capacity as police officers or were acting as agents or instruments of the Government at the time of the lease inspection, and were therefore subject to Fourth Amendment limitations.

### 1. Acting As Police Officers

▮ To determine whether an off-duty police officer is acting in his or her official capacity or acting as a private citizen, the Court must apply a twofold test. "First, we must examine the capacity in which the off-duty police officer was functioning when the officer initially confronted the situation and second, we must examine the manner in which he or she conducted himself or herself from that point forward." *State v. Andrews,* 33 Conn.App. 590, 637 A.2d 787, 790–91 (1994); *see also In re Albert S.,* 106 Md.App. 376, 664 A.2d 476, 484–85 (1995) ("[w]hether state action exists [for purposes of constitution] in a given case is not measured by the primary occupation of actor, but by the capacity in which he or she acts at the time in question." (citation omitted)); *State v. Graham,* 130 Wash.2d 711, 927 P.2d 227, 233 (1996) ("If an off-duty officer conducts a search or performs an arrest pursuant to his or her authority as a police officer, the officer would be acting on behalf of the state and would, therefore, be required to comply with the constitution."); *Commonwealth v. Leone,* 386 Mass. 329, 435 N.E.2d 1036, 1041 (1982) (the Fourth Amendment must be applied to the conduct of an off-duty officer whenever the officer "steps outside [the] sphere of legitimate private action.").

Numerous courts addressing the issue have held that a search by an off-duty law enforcement officer in his or her capacity as a private citizen, and not as a law enforcement officer, does not violate the prohibition against unreasonable searches and seizures. *See, e.g., United States v. Abney,* No. 03–CR–60 (JGK), 2003 WL 22047842, at *6 (S.D.N.Y. Aug.29, 2003) (off-duty officer employed as a store security guard was not acting as a police officer when he questioned a customer concerning counterfeit bills and seized such bills after the customer emptied his pockets); *State v. Walker,* 236 Neb. 155, 459 N.W.2d 527, 532 (1990) (finding that off-duty law enforcement officer who was also a landlord was not acting as a law enforce-

ment officer at the time he observed drug paraphernalia while visiting a tenant's apartment to check on the status of repairs); *State v. Pearson*, 15 Or.App. 1, 514 P.2d 884, 887 (1973) (upholding a search where an off-duty police officer discovered marijuana in a car on which he was working in his employment as a mechanic); *Goodwin v. State*, 222 Ga.App. 285, 474 S.E.2d 84, 86 (1996) (off-duty officer working as a security guard at a hotel was not acting as a police officer when, pursuant to employer's instructions, he stopped each car driving onto the premises to ask whether the occupants were hotel guests).

Among the decisions that have found that an off-duty police officer was acting in his or her official capacity are: *Ex Parte Kennedy*, 486 So.2d 493, 495 (Ala.1986) (off-duty police officer employed as an exterminator acted as a police officer when he removed a leaf from a plant he suspected to be marijuana in a home while working as an exterminator); *State v. Woods*, 790 S.W.2d 253, 257 (Mo.Ct.App.1990) (off-duty police officer acted in his capacity as a law enforcement officer when he searched a cabin after observing marijuana in plain view while employed as a caretaker of the property); *State v. LeGassey*, 456 A.2d 366, 367 (Me.1983) (off-duty Baxter State Park ranger who happened upon defendant, after defendant had plunged his car into snowbank, was acting in his official capacity when the ranger placed defendant in his ranger truck which bore a state insignia and told him to stay there); *State v. Brothers*, 4 Or.App. 253, 478 P.2d 442, 444 (1970) (off-duty chief of police, who was called to the scene of a shooting in his capacity as an ambulance driver, was acting within his official capacity as a police officer when he returned to the scene of the shooting, after taking the victim to a hospital, and entered an apartment without permission and conducted a search of the premises); *Commonwealth v. Eshel-*

*man*, 477 Pa. 93, 383 A.2d 838, 842 (1978) (off-duty police officer who came across an abandoned car while looking for a friend in the woods was acting in his capacity as an police officer when he retrieved a package he suspected contained marijuana and gave it to the local sheriff).

### 2. Instruments or Agents of the Government

Numerous other courts have addressed the issue of whether an off-duty police officer is constrained by the Fourth Amendment by analyzing whether the officer was acting as an agent or instrument of the Government at the time of the search or seizure. *See, e.g., United States v. Abney*, No. 03–CR–60 (JGK), 2003 WL 22047842, at *3 (S.D.N.Y. Aug.29, 2003); *United States v. McGreevy*, 652 F.2d 849, 850 (9th Cir.1981); *United States v. Moniz*, 14 F.Supp.2d 1194, 1196 (D.Haw.1998).

In other words, even if Zampella, Gallop, and Leffingwell were acting in their private capacities as SMHA representatives at the time of the lease inspection, they would still be subject to the requirements of the Fourth Amendment if they were acting as agents or instruments of the Government at the time of the lease inspection. *Coolidge v. New Hampshire*, 403 U.S. 443, 487, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *United States v. Bennett*, 709 F.2d 803, 805 (2d Cir.1983) ("Although the surreptitious search of premises by a private party does not violate the Fourth Amendment, if, in conducting the search, the searcher is acting as an instrument or agent of the Government, there is a Fourth Amendment transgression.").

To determine whether a private individual acts as an instrument of the state, courts look to (1) whether the government was aware of and acquiesced in the conduct; and (2) whether the individual in-

tended to assist the police or further his own ends. *See United States v. Cleaveland*, 38 F.3d 1092, 1093 (9th Cir.1994); *see also United States v. Bennett*, 709 F.2d 803, 805 (2d Cir.1983).

"Whether a private party should be deemed an agent or instrument of the Government for Fourth Amendment purposes necessarily turns on the degree of the Government's participation in the private party's activities, a question that can only be resolved in light of the circumstances." *Skinner v. Rwy. Labor Executives' Assoc.*, 489 U.S. 602, 614, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (citations omitted).

For example, in *United States v. McGreevy*, 652 F.2d 849 (9th Cir.1981), the Ninth Circuit concluded that an off-duty police officer who was working for Federal Express was not acting as an instrument of the state when he opened a package and found contraband. *McGreevy*, 652 F.2d at 851. The Ninth Circuit commented that, "[the off-duty police officer] did not hold his Federal Express position because he was a police officer. He carefully separated the two jobs. He knew of no understanding between Federal Express and the DEA for the disposal of contraband." *Id.* Contrast this case with *State v. Carter*, 267 N.W.2d 385, 386 (Iowa 1978), where the court held that off-duty police officers who conducted a search were not private individuals because "[t]he men were police officers, they were in uniform, they carried sidearms. The record shows arrests were made by these guards as Des Moines police officers. Most significant of all, the whole arrangement was effected in cooperation with the Des Moines Police Department." *Carter*, 267 N.W.2d at 386.

### 3. Zampella and Gallop

The Court first examines whether Zampella or Gallop were acting in their official capacities as police officers or as agents of the Government at the time of the lease inspection.

The testimony at the suppression hearing demonstrated that Zampella has had a contractual relationship with SMHA to serve as the Security Coordinator since 2002. Tr. at 34. This employment was approved by the City of Schenectady Police Department. Gov't Ex. 5. Gallop has had a contractual relationship with SMHA for approximately seven or eight years and is paid a per inspection stipend. Tr. at 38. This employment was approved by the Glenville Police Department. Tr. at 184. As part of their contractual relationship with SMHA, both Zampella and Gallop were responsible for performing lease inspections to determine whether any lease violations existed. Tr. at 133, 176. At all times while working for SMHA, Zampella and Gallop are not also on-duty for their law enforcement employers, and thus identify themselves as SMHA representatives. Tr. at 135, 137, 184. Zampella and Gallop carefully separated their part-time employment for SMHA from their duties as police officers.

At the time of the lease inspection at 80 Steinmetz Homes on May 14, 2004, Zampella and Gallop were proceeding with a lease inspection in response to complaints and information received by Brucker, SMHA's tenant investigator, on May 10, 2004. Neither Zampella nor Gallop were in uniform or armed with their law enforcement firearms.[4] Tr. at 121–22, 137, 179. They both identified themselves as being SMHA representatives and not as

---

4. While Gallop testified that he had his police badge and handcuffs in his waist bag, neither were visible to Defendant until the handgun was observed, and at no time prior to the handgun being observed did Gallop identify himself as a police officer. Tr. at 179.

police officers. Tr. 104, 137. Although the lease inspection arose based on possible criminal conduct, i.e. drug trafficking, their actions were aimed at the discovery of lease violations. *See United States v. Abney,* No. 03–CR–60 (JGK), 2003 WL 22047842, at *4 (S.D.N.Y. Aug.29, 2003) ("[T]here is no authority cited that stands for the proposition that every interaction between an off-duty police officer and a possible crime requires the police officer to intervene as a police officer."); *United States v. Moniz,* 14 F.Supp.2d 1194, 1197 (D.Haw.1998) ("[T]he mere fact that an off-duty police officer conducts a search to find evidence of a crime does not render a search government action ..."); *United States v. McGreevy,* 652 F.2d 849, 851 (9th Cir.1981). Upon restraining the Defendant, Zampella contacted uniformed officers of City of Schenectady Police Department to transport Defendant to the precinct. Tr. at 143, 183.

■ Taking into account the capacity in which Zampella and Gallop were acting when they initially entered the apartment and their conduct during the lease inspection, the Court finds that both Zampella and Gallop were acting as SMHA representatives, not as police officers, and were exercising SMHA's authority to perform a lease inspection. Zampella and Gallop were off-duty from their law enforcement employment and entered the apartment pursuant to SMHA's legitimate instructions to its contractual representatives.

■ The Court also concludes that Zampella and Gallop were not acting as agents or instruments of the Government at the time of the lease inspection. Although it appears that the Government possessed some knowledge of the inspections and the suspicion of drug activity,[5] Zampella and Gallop both stated that their

intention was to perform their duties as SMHA representatives, which constitutes a legitimate independent motivation for conducting an inspection or search. *See United States v. Walther,* 652 F.2d 788, 792 (9th Cir.1981) (stating that a private party carrying out a legitimate business purpose of his employer constitutes an independent motivation for the search and seizure); *United States v. Chukwubike,* 956 F.2d 209, 212 (9th Cir.1992) (a doctor extracting and testing heroin-laden balloons from a patient was not acting as an agent of the government because the medical reasons for the search and seizure constituted a legitimate independent motive).

Because Zampella and Gallop were acting in their capacity as private individuals, not police officers, and not as agents or instruments of the Government, the Fourth Amendment does not apply to their actions as SMHA representatives.

### 4. Leffingwell and Canine Zimmer

The decision of SMHA and Zampella to procure the assistance of Leffingwell and canine Zimmer when performing the lease inspection at 80 Steinmetz Homes also potentially implicates the Fourth Amendment. An examination of the background of Leffingwell and canine Zimmer's participation in the lease inspection for SMHA deeply troubles this Court and leads to the conclusion that Leffingwell was acting in his capacity as a police officer or as an agent of the Government at the time he participated in the lease inspection.

At the suppression hearing, Gallop testified that approximately seven to eight years ago, he owned and cared for a canine that had been retired from law enforcement. Tr. at 185. At that time, a SMHA representative approached Gallop to inquire whether he and his canine would be

5. *See infra,* part 4.

interested in working for SMHA. Tr. at 177. His duties would be to participate in lease inspections with his canine to search and identify controlled substances prohibited by SMHA. *Id.* Approximately one to one and a half years later, Gallop's canine was put down, but Gallop continued to work for SMHA, participating in lease inspections and utilizing his knowledge to identify and test for controlled substances. *Id.*

To fill SHMA's need for a new canine unit, Zampella contacted Sheriff Buffardi of the Schenectady County Sheriff's Department. Tr. at 43, 66. The Sheriff's Department agreed to provide SHMA with canine units when needed in order to further train the canines. Tr. at 43, 66, 186. The canine units and their dog handlers have no contractual relationship with SMHA and are considered to be volunteering their time. Tr. at 42, 64. When a lease inspection is related to possible drug activity, Brucker or Zampella will contact the Schenectady Sheriff's Department and request that a canine unit be brought to the housing authority. Tr. at 111, 119.

At some point prior to the lease inspection on May 14, 2004, either Zampella or Brucker contacted Leffingwell to arrange the presence of a canine unit for the lease inspection at 80 Steinmetz Homes.[6] Leffingwell had no contractual or employment relationship with SMHA and the was volunteering his time in order to train canine Zimmer. Tr. at 42–43, 63. Zampella anticipated that Leffingwell would arrive in his police uniform, armed with a firearm, and possess handcuffs. Tr. at 150. Leffingwell did indeed have on his police uniform, and carried his handcuffs and service

revolver during the lease inspection. Tr. at 122, 144. At the suppression hearing, Richard Homenick ("Homenick"), assistant executive director of SMHA, testified that he was unsure whether Leffingwell was being paid by the Schenectady Sheriff's Department at the time of the lease inspection. Tr. at 63–64.

A completed "K–9 Utilization Report" for the Schenectady County Sheriff's Department indicates Leffingwell and his canine Zimmer were utilized by SMHA on May 14, 2004. Def. Ex. 2. The Report also indicates that Leffingwell was dispatched at 8:28 A.M., arrived at 8:36 A.M., and was cleared at 9:00 A.M. *Id.* The stated utilization was for a "drug search". *Id.*

As a result of this arrangement, the Court finds that Leffingwell was acting in his capacity as a police officer at the time of the lease inspection of 80 Steinmetz Homes on May 14, 2004. While Zampella and Gallop maintained an independent contractual relationship with SMHA, participated in the lease inspection pursuant to SMHA's legitimate instructions, and distinguished their duties between their law enforcement employers and SMHA, Leffingwell had no such independent reason to participate in the lease inspection. Leffingwell's participation derived from an existing arrangement or understanding between SMHA and the Schenectady County Sheriff's Department, not an independent existing contractual relationship with SMHA. Leffingwell was in effect the representative of the Schenectady County Sheriff's Department pursuant to the arrangement made between Zampella and Sheriff Buffardi, not an individual acting in his private capacity.[7] Simply

---

6. Brucker testified that, "[w]e called up the Sheriff's Department and asked them to bring the dog." Tr. at 119.

7. At the suppression hearing, numerous SMHA representatives referenced Leffingwell in his capacity as the representative of the Schenectady County Sheriff's Department. After being asked who was in uniform at the

defining Leffingwell as a volunteer on a training exercise does not eliminate the regular involvement of the Schenectady County Sheriff's Department through a previously arranged and ongoing relationship with SMHA representatives.

Additionally, nothing concerning Leffingwell's participation in the actual lease inspection supports the conclusion that he was acting in a capacity other than as a police officer. He was in full uniform, armed with a firearm and handcuffs while performing the lease inspection. Tr. 122, 144. He completed a Schenectady Sheriff's Department K–9 Utilization Form indicating that the stated reason for the search was a "drug search". Def. Ex. 2. The simple fact that Leffingwell felt compelled to complete a K–9 Utilization Form is indicative of his perception that he was performing the duties of a police officer and not acting in his private capacity.

The Government's stated reason or motivation for Leffingwell's participation in the lease inspection, to further train his canine Zimmer, does not clearly support the proposition that Leffingwell was participating in the lease inspection in his private capacity. The training of a law enforcement canine still serves to benefit the Schenectady County Sheriff's Department, by improving the canine's abilities for future use by law enforcement.[8] Such training could be done without potentially intruding into the Fourth Amendment rights of private individuals.

Alternatively, the Court finds that Leffingwell acted as an agent or instrument at the time of the lease inspection. According to the testimony of Homenick and Brucker, the Schenectady County Sheriff's Department was aware that SMHA representatives were requesting and receiving the assistance of law enforcement canines and dog handlers from the Sheriff's Department for the purpose of searching for controlled substances. Tr. at 42–43, 65, 111. The timing of the searches and their results were regularly conveyed to the Sheriff's Department. Tr. at 111–12. Therefore, the Schenectady County Sheriff's Department is deemed to have knowledge of and acquiesced to Leffingwell's involvement in the inspections performed by SMHA. As noted above, the stated intention of Leffingwell's participation, to further train the canine, still serves as a benefit to the Schenectady County Sheriff's Department. For purposes of determining whether an individual is acting as an agent or instrument of the Government, the Court does not recognize the further training of a law enforcement canine with respect to drug detection skills a legitimate independent motivation to conduct the search. *See United States v. Reed,* 15 F.3d 928, 932 (9th Cir.1993) (finding that a hotel owner's interest in snooping or finding evidence of criminal activity is not a legitimate independent motive).

Where police officers "actively participate in a search being conducted by pri-

---

time of the lease inspection, Brucker stated, "Mr. Zampella was not in uniform. I believe the Sheriff's Department was, though." Tr. at 122. Brucker also answered an inquiry concerning on what basis Leffingwell was participating in the lease inspection by stating, "[h]e is a courtesy from the [Schenectady County] Sheriff's Department." Tr. at 122. When Gallop was asked who assists in the routine inspections, he responded, "Schenectady County Sheriff's Department, they have

several dog handlers that assist us." Tr. 185–86. Homenick, after being confused as to who Leffingwell is, inquired, "[i]s that the Sheriff?" Tr. at 63.

8. SHMA Assistant Executive Director Homenick testified that the training of the canines was to enhance their abilities as drug detection dogs, for the benefit of the Schenectady County Sheriff's Department. Tr. at 66.

vate parties or else stand by watching with approval as the search continues, ... authorities are clearly implicated in the search and it must comport with Fourth Amendment requirements." *Fries v. Barnes,* 618 F.2d 988, 991 (2d Cir.1980) (quoting *United States v. Mekjian,* 505 F.2d 1320, 1327 (5th Cir.1975)). "The presence of law enforcement officers who do not take an active role in encouraging or assisting an otherwise private search has been held insufficient to implicate Fourth Amendment interests, especially where the private party has had a legitimate independent motivation for conducting the search." *United States v. Walther,* 652 F.2d 788, 792 (9th Cir.1981). "[D]e minimis or incidental contacts between the citizen and law enforcement agents prior to or during the course of a search or seizure will not subject the search to Fourth Amendment scrutiny." *Id.* at 791.

In this case, while SMHA had a legitimate motivation to inspect the apartment for lease violations, Leffingwell's presence was more than incidental. Leffingwell was a direct and active participant in the lease inspection. As a result of Leffingwell's involvement and direct participation in the lease inspection and the Schenectady County Sheriff's Department acquiescence to such involvement, the Court concludes the lease inspection constituted government action, and thus required compliance with the Fourth Amendment.

### C. Exceptions To The Warrant Requirement

Having found that the lease inspection constituted government action, the Court must also determine whether any exception to the Fourth Amendment's warrant requirement exists.

 Warrantless searches conducted by instruments of the state are *per se* unreasonable unless the search falls within one of a few specifically established and well delineated exceptions.[9] *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Absent exigent circumstances and probable cause, or consent, a warrantless entry and search is *per se* unreasonable, and violates the Fourth Amendment. *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). In the present case, the Government does not contend that exigent circumstances existed to justify the warrantless search and the Court does not find such circumstances. *Chambers v. Maroney,* 399 U.S. 42, 51, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

 The Government has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority. *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). For a warrantless search to be justified by consent, such consent must have been given by the defendant or a third party who possessed common authority over, or other sufficient relationship to, the premises or effects sought to be inspected. *United States v. Matlock,* 415 U.S. 164, 171–72, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

---

9. In *Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), the Supreme Court held that an individual's status as an overnight guest is alone enough to show that he or she has a legitimate expectation of privacy in the premises which is protected by the Fourth Amendment, and, thus, the person has standing to challenge a warrantless entry to effect his or her arrest. Under the same reasoning, Defendant, who was at least an overnight guest of his sister, Rowe, has standing to challenge the search involved here as violating his right to be free from unreasonable searches and seizures.

 "Generally, a landlord is not seen as having actual authority to consent to a warrantless police search of the premises occupied by a tenant." *State v. Licari*, 659 N.W.2d 243, 251 (Minn.2003); *see also United States v. Warner*, 843 F.2d 401, 403 (9th Cir.1988). "[A] landlord lacks actual authority even when she has 'by express agreement or by implication reserved the right to enter for some special and limited purpose.'" *Licari*, 659 N.W.2d at 251 (quoting 2 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 8.5(a) at 739 (1978)). Here, while Rowe consented to an inspection by SMHA in her lease agreement, such consent does not provide SMHA with actual authority to consent to a warrantless search by law enforcement officials of the premises exclusively occupied by Rowe.

The Court finds that no exception to the warrant requirement is applicable in the present case and that the entry therefore violated Defendant's Fourth Amendment rights.

Lastly, the Government's argument that the plain view exception applies is misplaced. The plain view exception assumes that the article seized is in plain view to an officer who is lawfully in a position to see the article. *See Coolidge v. New Hampshire*, 403 U.S. 443, 465–66, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Texas v. Brown*, 460 U.S. 730, 738–39, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). Since the initial entry into the apartment was performed without a warrant and in violation of the Fourth Amendment, Leffingwell and canine Zimmer were not lawfully in Rowe's apartment, and the plain view exception does not apply. *See United States v. Thomas*, 757 F.2d 1359, 1367 (2d Cir.1985).

To give effect to the Fourth Amendment's guarantee against unreasonable searches and seizures, and to deter illegal police conduct, the Court must apply the exclusionary rule and suppress any evidence unconstitutionally obtained. *See Nix v. Williams*, 467 U.S. 431, 442–43, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *Weeks v. United States*, 232 U.S. 383, 398, 34 S.Ct. 341, 58 L.Ed. 652 (1914). Therefore, evidence of Defendant's possession of the handgun is suppressed.

The Supreme Court's fruit-of-the-poisonous-tree doctrine also bars the use of evidence obtained either during or as a direct result of an unlawful invasion. *See Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). As a result of the application of the fruit-of-the-poisonous-tree doctrine, statements made by Defendant on May 14, 2004 after the unlawful entry with regards to ownership of the gun are also suppressed.

### III. CONCLUSION

Accordingly, it is hereby

ORDERED that Defendant's Motion to Suppress the physical evidence and statements taken from him on May 14, 2004 is **GRANTED**; and it is further

ORDERED that physical evidence concerning the handgun seized from Defendant on May 14, 2004 and statements made by Defendant concerning ownership of the handgun are **SUPPRESSED**; and it is further

ORDERED that the Clerk of the Court shall serve copies of this order by regular mail upon the parties to this action.

IT IS SO ORDERED.